IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Prime Insurance Syndicate,** | : | **No. 3:05cv1692** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| v. | : | |
| | : | |
| **Association of Property Owners of Hideout, Inc.** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the court is Plaintiff Prime Insurance Syndicate's (hereinafter "Prime") motion for summary judgment (Doc. 20) in the instant declaratory judgment action. Having been fully briefed and argued, this matter is ripe for disposition.

## Case Background

The events that led to this declaratory judgment action took place at The Hideout in Lake Ariel, Pennsylvania. The Hideout is a large planned community with swimming pools, recreation areas and a golf course. (See Complaint in Case No. 05cv1345, attached as Exhibit 4 to Plaintiff's Motion for Summary Judgment (Doc. 20)). On August 27, 2004, Kevin and Kathleen Sinclair and their two children, who had been invited to the property and were staying with a resident, were in a swimming pool and manmade beach area owned by Defendant Association of Property Owners of Hideout, Inc. (hereinafter "The Hideout"). (Id. at ¶ 4). Around 5 p.m., a group of "urban teenagers" came into the swimming area without permission of the property owners. (Id.). A security guard tried to evict them, but failed. (Id.).

The young people circled the guard and verbally abused him, and they seemed about to attack him. (Id.). Kevin Sinclair, an off-duty New York City police officer, went to the guard's aid. (Id. at ¶ 5). At that time, one youth punched Sinclair in the face, another jumped on his back and choked him, and a third hit him in the face with a skateboard. (Id.). One of the teenagers then called for help from friends, and six or seven other young people arrived. (Id. at ¶ 6). This combined group chased Kevin Sinclair into a lifeguard shack, where they punched, kicked and beat him with a folding chair, stool and garbage can. (Id.).

This beating aggravated a pre-existing condition for Kevin Sinclair, and left him with permanent damage to nerves, ligaments, tendons, muscles and soft tissues throughout the body, spinal injuries, a concussion, confusion, severe headaches, vomiting, blurred vision, convulsions, disfigurement, scarring, post-traumatic stress syndrome and other health problems. (Id. at ¶ 10). On July 5, 2005, Sinclair and his wife sued The Hideout, alleging that negligence in supervision and training led to Sinclair's injuries. (Id.). On or about July 22, 2005 The Hideout provided notice to its liability insurer, Prime, of the complaint and sought coverage. (Brief in Support of Motion for Summary Judgment (Doc. 21) at 8). On August 18, 2005, the plaintiff filed this action, seeking a declaratory judgment that the company is not obligated under the policy to defend or indemnify The Hideout. (Complaint (Doc. 1) at 1). On June 21, 2006, Prime filed a motion for summary judgment. (Doc. 20).

**Jurisdiction**

As this case is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, we have jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"). Because the amount in controversy in the case exceeds $75,000.00, the plaintiff is a corporation organized under the laws of the State of Utah with its principal place of business in Sandy, Utah, and the defendant is a corporation organized under Pennsylvania law with its principal place of business in Lake Ariel, Pennsylvania, we also have diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

**Legal Standard**

Prime moves for summary judgment in this case. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. <u>International Raw Materials, Ltd. v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. <u>Id.</u> Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. <u>Id.</u> at 324.

This case is a declaratory judgment action asking the court to determine whether Prime has an obligation to defend The Hideout in the action that grew out of the attack on Kevin Sinclair. Because interpreting the provisions of a contract is a matter of law reserved for the court, we can decide this case based on the insurance contract provided us by the parties and other evidence included in their filings. See <u>Standard Venetian Blind Co. v. American Empire Ins. Co.</u>, 469 A.2d 563, 566 (Pa. 1983) ("The task of interpreting a contract is generally performed by a court rather

than by a jury.").

"A carrier's duties to defend and indemnify an insured in a suit brought by a third party depend upon a determination of whether the third party's complaint triggers coverage." Mutual Benefit Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999). In that setting, the court follows a two-step process: "A court's first step . . . is to determine the scope of the policy's coverage." General Accident Ins. Co. of America v. Allen, 692 A.2d 1089, 1094 (Pa. 1997). Next, "the court must examine the complaint in the underlying action to ascertain if it triggers coverage. If the complaint against the insured avers facts that would support a recovery covered by the policy, then coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery the policy does not cover." Id. at 1095.

The duty to defend is based on the allegations in the underlying complaint, and the insurer has an "obligation to defend if the factual allegations of the complaint on its face comprehend an injury which is actually or potentially within the scope of the policy." The Aetna Casualty and Surety Co. v. Roe, 650 A.2d 94, 99 (Pa. Super. Ct. 1994). When an insurer asserts an exclusion as a defense to a claim of a duty to defend, "the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." Madison Construction Co. v. Harleysville Ins. Co., 735 A.2d 100, 106 (Pa. 1999). In interpreting an insurance contract the court will give effect to the language of contract when that language is clear and unambiguous. Standard Venetian Blind Co., 469 A.2d at 566. If the language is

ambiguous, "the policy provision is to be construed in favor of the insured and against the insurer." Id. Ambiguity exists for a contractual term "'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" Madison Construction Co., 735 A.2d at 106 (quoting Hutchinson v. Sunbeam Coal Co., 519 A.2d 385, 390 (Pa. 1986)).

**Plaintiff's Motion for Summary Judgment**

Prime argues that the claim does not fall within the coverage provided by the policy because the underlying incident was not an accident, that The Hideout failed to provide proper notice of the potential claim, and that the claim did not fall within the coverage period. We will address each argument in turn.

As a preliminary matter, we note that the insurance policy in question offers coverage "for claims that (1) are first made against the insured during the policy period; (2) arise from an accident that occurred during the policy period; and (3) are reported in writing to the insurer during the policy period." (See Insurance Agreement between Prime Insurance and Association of Property Owners of the Hideout, Inc., attached as exhibit to plaintiff's motion for summary judgment (Doc. 20) at 1 (hereinafter "Insurance Contract")). The policy period was from 1/01/2004 until 1/01/2005. (Id.).

**A. The Underlying Action Was Not an Accident as Defined by the Policy**

Prime argues that it has no duty to defend The Hideout in the underlying action. The language of the policy indicates that coverage applies only to

"accidents." (Brief in Support of Motion for Summary Judgment of Plaintiff, Prime Insurance Syndicate, Inc. (Doc. 21) at 11 (hereinafter "Plaintiff's Brief")). Since the injury here arose from an intentional act (an assault), Prime argues that the policy does not provide coverage. (Id. at 11, 13). The Hideout responds that the underlying complaint pled causes of action for "careless and negligent conduct" by the Hideout, including "doing nothing, failure to discipline rowdy teenagers, failure to prevent fights, failure to summon police, failure to control premises and protect patrons, failure to publish the fact that the pool and beach areas were dangerous and should be avoided, failure to warn of dangerous conditions at the pool and beach area," and other failures to observe due care. (Brief in Opposition to Motion for Summary Judgment (Doc. 29) at 5-6 (hereinafter "Defendant's Brief"). These allegations, the Hideout contends, sound in negligence and should be covered by the policy. (Id. at 6).

We find that the clear and unambiguous language of the policy excludes coverage for the underlying complaint. In pertinent part, the agreement covered claims related to "accidents." (Insurance Policy at 4). The policy defines an "Accident" as "an incident, event or circumstance which is unexpected and unintended from the standpoint of any Insured." (Id. at 18). The agreement clearly establishes that coverage is available only for "accidents," and there can be no dispute that if an event meets the definition of "accident" provided in the policy, Prime will be required to cover it. No ambiguity as to the terms of the contract exists,

and we are required only to determine whether the acts alleged in the complaint meet the definition of "accident" provided in the policy and therefore require coverage.

While the complaint against Hideout raises claims that appear to sound in negligence and thus could be an "accident" under the policy, the facts which give rise to those claims indicate that they resulted from an intentional act. The complaint does not allege an accidental occurrence led to Mr. Sinclair's injuries, but instead connects them all to the beating he received from the young people on Hideout property, which was not an accident. See Gene's Restaurant, Inc. v. Nationwide Ins. Co., 548 A.2d 246, 247 (Pa. 1988) (finding that "the willful and malicious assault alleged in the complaint is not an accident but rather is an intentional tort"). In cases like this one, where coverage exists only for accidents, we are required to determine whether the facts as alleged in the underlying complaint could establish a cause of action for an unintentional tort. See Mutual Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999) (holding that "the particular cause of action that a complaint pleads is not determinative of whether coverage has been triggered. Instead it is necessary to look at the factual allegations contained in the complaint."). A party may not plead negligence to get around policy provisions limiting coverage to accidents. Id. (noting that to allow such complaints would "encourage litigation through the use of artful pleadings designed to avoid exclusions in liability insurance policies."). We find that the facts alleged in the underlying case indicate that Kevin Sinclair's injuries all

resulted from the vicious beating he received. The beating was not an accident, and plaintiff has no duty to defend.

Prime also points to language in the policy to argue that it has no duty to defend claims of negligence in hiring, security or supervision against defendant. (Plaintiff's Brief at 17). The relevant portion of the policy excludes coverage for:

> Claims related to or arising out of actual or alleged assault and/or battery, whether caused by or at the direction of the insured, the insured's employees or patrons, or from any cause whatsoever. This Policy further excludes claims, accusations, or charges of negligent hiring, placement, training, or supervision regarding any actual assault and battery. No coverage is provided for Claims alleging negligent hiring or entrustment, training or supervision, failure to provide adequate security, or other allegations of intentional, negligent, or reckless conduct related to actual or alleged assault and/or battery. (Insurance Contract at 6).

The language of this exclusion is clear and unambiguous, laying out exactly which claims arising from assault and battery will not be covered. The terms that establish the exclusion are not susceptible to two, equally plausible readings. We are thus required to interpret the policy as written, and we find that this policy exclusion relieves plaintiff of any duty to defend or indemnify defendant in the underlying case. While the complaint alleges negligence in supervision and hiring, the exclusion clearly covers those claims, since there are no factual allegations of a separate accident that caused Sinclair's injuries. See, e.g. Acceptance Ins. Co. v. Seybert, 757 A.2d 380, 381 (Pa. Super. Ct. 2000) (finding that claims of negligence in a complaint did not avoid an assault and battery exclusion because "the Complaint contains no allegations that Seybert's actual injuries were caused in a way other

than by assault and battery by the five men in the Monroe parking lot. There is no suggestion that Seybert's injuries were an accident . . . or were negligently caused directly by Belmont employees.").

## B. Failure to Notify Prime of the Incident Giving Rise to the Potential Claim

While we could grant summary judgment based on our reading of the coverage provided by the insurance contract, in the interest of completeness we will address Prime's contention that The Hideout failed to provide timely notice of an incident which could lead to a potential claim as required by the policy. The terms of the policy are clear and unambiguous, requiring the insured to provide "immediate written notice no later than 14 days after the incident, event, occurrence, loss or Accident which might give rise to a Claim covered by this Policy." (Insurance Contract at 15). These terms are not susceptible to more than one meaning, and clearly require notice when a potential claim arises. The insured may not wait to see if a party files a lawsuit after an incident, as defendant did here, but must act within fourteen days of any incident as an "express condition" of the policy. (Id.).

The incident for which coverage is sought occurred on August 27, 2004, and Hideout representatives filed a twelve-page internal incident report that described the attack on Kevin Sinclair in detail that evening. (See Hideout Security Incident Report, attached as Exhibit 3 to Plaintiff's Reply to Defendant's Brief in Opposition to Motion for Summary Judgment (Doc. 31) at 1). The Hideout was thus aware of the incident that led to the Sinclairs' lawsuit immediately after it happened on August 27,

10

2004, yet first notified Prime of the incident on July 22, 2005. (See General Notice of Occurrence Claim, attached as Exhibit 6 to Brief in Support of Motion for Summary Judgment (Doc. 21) at 1). Because the Hideout failed to provide notice to the company of the potential claim within the two weeks required by the policy, Prime has no duty to defend.

## C. The Claim Arose Outside the Period Covered by the Policy

In addition, The Hideout made its claim to Prime regarding the lawsuit the Sinclairs filed outside the period covered by the policy.[1]  In clear and unambiguous

---

[1] The parties disagree as to the type of policy they signed. There are generally two types of liability policies: claims-based and occurrence-based policies. Claims-based policies provide coverage for claims made during the policy period, regardless of when the incidents that gave rise to the claim occurred. Occurrence-based policies offer coverage for incidents that occur during the period covered by the policy, even if the claim related to that incident is filed after the policy period ends. Prime admits that the terms of the policy in question has the restrictions of both types of policies, limiting coverage to events that occurred during the policy period and were claimed during the policy period. Prime avers that no case law exists about how to interpret such a policy. Generally, under a claims-based policy, the notice requirements are absolute. If an insured fails to notify the insurer of the claim during the policy period, no coverage is available. See Women's Christian Alliance v. Executive Risk Indemnity, Inc., No. Civ. A. 02-2594, 2003 WL 21961434, *17-20 (E.D. Pa. July 3, 2003). Under an occurrence-based policy, an insured who fails to meet the policy's notice requirements can obtain coverage, unless the insurer can show actual prejudice from allowing the claim. Id. at *17. The difference in standards for these two types of policies exists because the parties in a claims-based policy bargain for the contract based on when claims can be made; allowing the coverage to extend beyond the notice period would amount to "an extension of coverage to the insured gratis, something for which the insurer has not bargained." City of Harrisburg v. International Surplus Lines Ins. Co., 596 F. Supp. 954, 960 (M.D. Pa. 1984). The Hideout argues that the notice provision o f the policy "is ambiguous and drafted to confuse The Hideout based on standard accepted insurance policies which are either 'occurrence based' or 'claim based' policies." (Defendant's Brief at 7). Prime never explained this distinction, and The Hideout lacked knowledge of the strict reporting provisions of the policy. (Id.). The Hideout argues that this ambiguity should lead the court to apply the rules for occurrence-based policies and excuse the reporting requirements unless Prime can show prejudice. (Id. at 8). Because we find Prime has no duty to defend on other grounds, and because neither party

11

language the insurance contract establishes that only claims which both "are first made against the insured during the policy period . . . [and] are reported in writing to the insurer during the policy period" are covered. (Insurance Contract at 4). Since the Sinclairs first filed their lawsuit against The Hideout in July 2005, seven months after coverage on the policy ended, the claim against The Hideout was not made during the policy period. Since The Hideout did not report that claim in writing to Prime until later that month, the claim was also not reported in writing to Prime within the period covered by the policy. The Hideout's claim related to the Sinclairs' lawsuit thus fell outside the coverage period of the policy, and Prime has no duty to defend against that suit.

### D. Ambiguity and Unconscionability of the Policy

Hideout claims that it should not be required to observe these time requirements because the policy is ambiguous. (Defendant's Brief at 7). The document contains a statement in the first paragraph that describes it as a "manuscript policy." (Id.). The Hideout's representative in this process claims that he did not understand the legal significance of a "manuscript policy," and Prime never explained that provision to him. (See Affidavit of Ralph Graf (Doc. 30) at ¶¶ 5-6). A manuscript policy is one written during negotiations between two savvy parties. See Port Authority of New York and New Jersey v. Affliliated FM Ins. Co., 311 F.3d

---

has provided authority to guide us in interpreting this portion of the contract, we decline to reach the question of whether this type of policy should require a showing of prejudice to dismiss late-filed claims.

226, 231 (3d Cir. 2002) (finding that "unlike usual contracts of adhesion, the manuscript policies issued by the defendants were drafted by plaintiffs with the aid of counsel and insurance professionals, and in some respects, negotiated with the underwriters."). These contracts are different from normal insurance policies, which typically are adhesion contracts made up of boilerplate language. Id. Because negotiation between knowledgeable parties creates a manuscript policy, courts do not generally have to interpret policy provisions to the benefit of the insured as they would with other such contracts. Id. The Hideout contends that, despite this language, the policy is really an adhesion contract made in a fashion similar to most insurance agreements, and that calling it a manuscript policy makes the entire policy "ambiguous and misleading." (Defendant's Brief at 7). As a result, we should interpret the terms of the contract in favor of the defendants. (Id.).

Even if the term "manuscript policy" rendered the contract ambiguous in a general sense, we would not read the contractual terms in question differently. Evidently the policy here was not arrived at in the way that other "manuscript" policies are negotiated, and the similarity of the clauses in the contract to other liability policies cited in the cases indicates that the contractual language is largely form language. In that sense, we could conclude that the contract is more like an adhesion contract than a manuscript contract, and interpret it in the way we interpret most insurance contracts–by resolving all ambiguous provisions to the benefit of the insured. See Bateman v. Motorists Mutual Ins. Co., 590 A.2d 241, 245 (Pa. 1991)

(finding that for insurance contracts "[r]eview is aimed at ascertaining the intent of the parties as manifested by the language of the written instrument. Where the provision of the policy is ambiguous, the policy provision is construed in favor of the insured and against the insurer, the drafter of the instrument. If the policy language is clear and unambiguous, we give effect to the language of the contract."). Since we have not found any of the contract terms material to resolving this dispute unclear or ambiguous, there is no need to determine in whose favor we should interpret the terms. Declaring this a "manuscript" contract would not have any effect on how we interpret the provisions in question.

The Hideout also contends that the notice provisions of the contract are unconscionable and that the court should not enforce their terms. (Defendant's Brief at 8). The Hideout claims it lacked a "'meaningful'" choice because it was unaware of the terms of the policy, and references an affidavit from the party who signed the policy to say that it was unaware that it had signed such a restrictive document.[2] (Id. at 9). The notice provisions were unconscionable, The Hideout argues, because they meant that Prime would rarely, if ever, actually have to pay a claim, and because The

---

[2]This affidavit was executed by Ralph Graf, Community Management for the Association of Property Owner's [sic] of The Hideout, Inc. on August 1st, 2006. (Doc. 30). While the document avers that Graf did not understand the significance of calling the document a "manuscript policy" and never had that significance explained to him, the affidavit also declares that Graf had a general understanding of the difference between claims-based and occurrence-based policies. (Id. at ¶¶ 4-6). These averments seem to undermine The Hideout's claim that Graf did not understand the restrictive nature of the policy he signed.

14

Hideout was unaware of the terms when signing the contract. (Id.).

Unconscionability requires that a party show it had no meaningful choice in making the contract, and that the terms of the contract unreasonably favor the other party. Snyder v. Rogers, 499 A.2d 1369, 1372-73 (Pa. Super. Ct. 1985). The Hideout contends that it was unclear as to the exact reporting terms of the policy. This complaint is not the same as evidence that the defendant lacked a meaningful choice in deciding to contract for the policy, and is certainly no reason not to enforce the contract's terms. See Standard Venetian Blind Co., 469 A.2d at 567 (finding that "where . . . the policy limitation relied upon by the insurer to deny coverage is clearly worded and conspicuously displayed, the insured may not avoid the consequences of that limitation by proof that he failed to read the limitation or that he did not understand it."). In order to find that a party lacked "meaningful choice" in making an agreement, we need to consider each side's bargaining position and ask whether one side's position was "grossly inferior" to the other's. Snyder, 499 A.2d at 1371. The record contains no evidence of coercion or improper pressure to sign the contract, and no evidence of a gross imbalance in power between the parties that would allow one side to dictate terms, leaving the other unable to refuse. The evidence simply indicates that the Hideout's representative did not understand the significance of designating the contract as a "manuscript" policy. We cannot therefore find that the Hideout lacked a meaningful choice in purchasing insurance.

We also do not find the terms of the contract unconsionable. While the

reporting requirements may have been onerous and the policy period restrictive, those terms were clear and unambiguous, and the defendant chose to agree to them. The Hideout offers no evidence that the consideration for agreeing to those terms was inadequate. Accordingly, we find that Prime has no duty to defend The Hideout in the underlying matter. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Prime Insurance Syndicate,** | : | **No. 3:05cv1692** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **Association of Property Owners of Hideout, Inc.** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

**AND NOW**, to wit, this 19th day of December 2006:

1) the plaintiff's motion for summary judgment (Doc. 20) is hereby **GRANTED**.

2) Prime Insurance Syndicate has no duty to indemnify or defend the Association of Property Owners of Hideout, Inc. in *Sinclair v. HideOut, Inc.*, No. 05cv1345

3) The Clerk of Court is directed to close the case.

BY THE COURT:

s/ James M. Munley
JUDGE JAMES M. MUNLEY
United States District Court